No. 14-56615 [D.C. 2:13-cv-02605]
_____

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
_____

SIGITAS RAULINAITIS

Plaintiff-Appellant

v.

VENTURA COUNTY SHERIFF'S DEPARTMENT

Defendant-Appellee
_____

**APPELLEE'S RESPONDING BRIEF**
_____

On Appeal from the United States District Court
For the Central District of California
Hon. Margaret A. Nagle
_____

LEROY SMITH, CSB 107702
County Counsel, County of Ventura
MARINA PORCHE, CSB 162809
Assistant County Counsel
800 South Victoria Avenue, L/C #1830
Ventura, California 93009
Telephone: (805) 654-2583
Fax: (805) 654-2185
E-mail: marina.porche@ventura.org

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II    ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.    Key Statutory and Constitutional Provisions Pursuant to Circuit Rule 28-2.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       A.    The District Court Relied on the Parties' Binding Factual Stipulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.    Evidence of Residency From Raulinaitis's First Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       C.    Evidence of Residency From Raulinaitis's Second Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       D.    Evidence of Residency From the Sheriff's Investigation . . . . . . . . . 8

            1.    Raulinaitis's First CCW Application . . . . . . . . . . . . . . . . . . . . 8

            2.    The Sheriff's Surveillance of Raulinaitis after Raulinaitis's First CCW Application . . . . . . . . . . . . . . . . . . . 11

            3.    Raulinaitis's Second CCW Application . . . . . . . . . . . . . . . . . 13

            4.    The Sheriff's Surveillance of Raulinaitis After His Second CCW Application . . . . . . . . . . . . . . . . . . . . . . . . 13

E.      Raulinaitis's Listing of the Oxnard Condominium
        for Sale and No Evidence of Raulinaitis's Estrangement
        From His Wife . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

F.      Raulinaitis's Failure to Dispute Any of the Factual
        Assertions Set Forth in the Sheriff's Statement of
        Uncontroverted Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VII     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.      The Sheriff's Interpretation of the County Residency
        Requirement Comports with Case Law, Common
        Statutory Usage and Legislative History . . . . . . . . . . . . . . . . . . . . 19

        1.       California Statutes Frequently Use the Terms
                 "Resident" and "Domicile" Interchangeably . . . . . . . . . . . 20

        2.       Domicile Requires a Combination of Actual
                 Presence and Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        3.       Legislative History Supports the Sheriff's
                 Interpretation of the Residency Requirement . . . . . . . . . . . 25

        4.       The Sheriff's Interpretation of Residency
                 Complying with Common Statutory Usage,
                 Pertinent Case Law and Legislative History
                 Protects Public Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B.      The Record Below Does Not Give Rise to a Genuine
        Dispute of Material Fact that Raulinaitis Is a Resident
        of Ventura County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.      The Sheriff Did Not Violate the Second Amendment . . . . . . . . . . 32

**TABLE OF CONTENTS (Cont'd.)**

1.   Enforcement of a Statutory County Residency
     Screening Requirement Does Not Implicate Second
     Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.   In Any Event, the Sheriff's Application of
     California's Statutory Residency Requirement
     Would Easily Survive Intermediate Scrutiny Review . . . . . . 38

VIII   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**TABLE OF AUTHORITIES**

Page

**FEDERAL CASES**

*Clark v. City of Lakewood* (9th Cir. 2001)
    259 F.3d 996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*District of Columbia v. Heller* (2008)
    554 U.S. 570 [128 S.Ct. 2783, 171 L.Ed.2d 637] . . . . 32, 33, 34, 35, 36, 37

*Dorr v. Weber* (N.D. Iowa 2010)
    741 F.Supp.2d 993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Drake v. Filko* (3d Cir. 2013)
    724 F.3d 426 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Embody v. Ward* (6th Cir. 2012)
    695 F.3d 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Gamble v. U.S.* (D.C. Ct. App. 2011)
    30 A.3d 161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hauk v. JP Morgan Chase Bank USA* (9th Cir. 2009)
    552 F.3d 1114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Henderson v. City of Simi Valley* (9th Cir. 2002)
    305 F.3d 1052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Hightower v. City of Boston* (1st Cir. 2012)
    693 F.3d 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Kachalsy v. County of Westchester* (2d. Cir. 2012)
    701 F.3d 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Karl Storz Endoscopy America, Inc. v. Surgical Technologies, Inc.* (9th Cir. 2002)
    285 F.3d 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McDonald v. City of Chicago* (2010)
561 U.S. 742 [130 S.Ct. 3020, 177 L.Ed.2d 894] . . . . . . . . . . . . . . . . . 32, 38

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.* (C.D.Cal. 2008)
568 F.Supp.2d 1152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Moore v. Madigan* (7th Cir. 2012)
702 F.3d 933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Nichols v. Brown* (C.D. Cal. 2013)
945 F.Supp.2d 1079 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Penn. Mut. Life Ins. Co. v. Fields* (S.D. Cal. 1984)
81 F.Supp. 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Peruta v. County of San Diego* (9th Cir. 2014)
742 F.3d 1444 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 41

*Peterson v. Martinez* (10th Cir. 2013)
707 F.3d 1197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Robertson v. Baldwin* (1897)
165 U.S. 275 [17 S.Ct. 236, 41 L.Ed. 715] . . . . . . . . . . . . . . . . . . . . . . 33, 37

*Schall v. Martin* (1984)
467 U.S. 253 [104 S.Ct. 2403, 81 L.Ed.2d 207] . . . . . . . . . . . . . . . . . . . 39

*State of Texas v. State of Florida* (1939)
306 U.S. 398 [59 S.Ct. 563, 83 L.Ed. 817] . . . . . . . . . . . . . . . . . . . . . . . 22

*U.S. v. Chovan* (9th Cir. 2013)
735 F.3d 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*U.S. v. Hart* (D.Mass 2010)
726 F.Supp.2d 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*U.S. v. Masciandaro* (4th Cir. 2011)
   638 F.3d 458  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Salerno* (1987)
   481 U.S. 739 [107 S.Ct. 2095, 95 L.Ed.2d 697] . . . . . . . . . . . . . . . . . . . . . 39

*Woollard v. Gallagher* (4th Cir. 2013)
   712 F.3d 865  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**STATE CASES**

*Aldabe v. Aldabe* (1962)
   209 Cal.App.2d 453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Burt v. Scarborough* (1961)
   56 Cal.2d 817 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Eriksen v. Eriksen* (1943)
   57 Cal.App.2d 532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fenton v. Board of Directors* (1984)
   156 Cal.App.3d 1107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Marriage of Amezquita & Archuleta* (2002)
   101 Cal.App.4th 1415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Marriage of Thornton* (1982)
   135 Cal.App.3d 500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Hale* (1974)
   43 Cal.App.3d 343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Yarbrough* (2008)
   169 Cal.App.4th 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Smith v. Smith* (1955)
   45 Cal.2d 235 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Walters v. Weed* (1983)
   45 Cal.3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Whittel v. Franchise Tax Bd.* (1964)
   231 Cal.App.2d 278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATE STATUTES**

**Civil Code**

   § 128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Code of Civil Procedure**

   § 395 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   § 417 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

**Family Code**

   § 4962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Government Code**

   § 243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24
   § 244 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24
   § 61200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Penal Code**

   § 12050 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   § 17020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   § 20510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   § 20910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Penal Code (Cont'd.)**

§ 21310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
§ 21810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
§ 22210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
§ 26150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 20, 25, 28, 29, 30, 32
§ 26150, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 29
§ 26150, subdivision (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 26150, subdivision (a)(3) . . . . . . . . . . . . . . . . . . . 1, 2, 4, 5, 19, 30, 31
§ 26210, subdivision (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
§ 26220, subdivision (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Probate Code**

§ 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**OTHER AUTHORITIES**

Enrolled Bill Memorandum to Governor for SB 1272, August 20, 1969 . . . . . . . 26

# I

## INTRODUCTION

Appellant Sigitas Raulinaitis's ("Raulinaitis") opening brief ignores relevant portions of the evidentiary record as well as the legal basis for the district court's grant of summary judgment to appellee Ventura County Sheriff's Department ("the Sheriff").  Pursuant to Circuit Rule 28(b), the Sheriff submits its own statement of the issues, statement of the case, statement of facts, and statement of the standard of review.

The Sheriff concurs with the statement of jurisdiction submitted by Raulinaitis.

# II

## ISSUES PRESENTED FOR REVIEW

1.  Does the Sheriff's interpretation of the term "resident," as a person who spends most of his time and conducts most of his activities in Ventura County, comply with California Penal Code section 26150, subdivision (a)(3), with respect to the county residency requirement for a person applying to a county sheriff for a license to carry a concealed weapon ("CCW")?

2.  Does the record give rise to a genuine dispute of material fact that Raulinaitis was a resident of Ventura County under California Penal Code section 26150, subdivision (a)(3)?

3.  Does the Sheriff's application of the county residency requirement in California Penal Code section 26150, subdivision (a)(3), violate Raulinaitis's Second Amendment rights?

These issues formed the basis for the district court's grant of summary judgment to the Sheriff (ER 134-182) and were raised by the Sheriff in the district court.  (ER 26-64 & 78-111.)

## A.    Key Statutory and Constitutional Provisions Pursuant to Circuit Rule 28-2.7

California Penal Code section 26150, subdivision (a), states:

> "(a) When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff of a county may issue a license to that person upon proof of all of the following:
>
> "(1)  The applicant is of good moral character.
>
> "(2)  Good cause exists for the issuance of a license.
>
> "(3)  The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is the county or city within the county and the applicant spends a substantial period of time in the place of employment or business.

"(4)  The applicant has completed a course of training as described in Section 26165."

The Second Amendment of the United States Constitution states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

## III

## STATEMENT OF THE CASE

On September 30, 2014, the trial court entered an order granting the Sheriff's motion for summary judgment and denying Raulinaitis's second motion for summary judgment (Excerpt of Record ("ER") 134-181), and the court entered judgment dismissing the Sheriff's action on the merits with prejudice. (Supplemental Excerpt of Record ("SER") 5.)  Raulinaitis filed a notice of appeal on October 6, 2014.  (ER 1.)

Raulinaitis also filed a previous motion for summary judgment (SER 78-85), which was denied by the court in an order dated December 31, 2013. (SER 9-33.)  Raulinaitis did not seek reconsideration of the court's first order denying summary judgment, although the court afforded Raulinaitis an opportunity to file a belated motion for reconsideration.  (SER 7.)

# IV

## SUMMARY OF ARGUMENT

Raulinaitis contends that for purposes of a CCW license, residency under California Penal Code section 26150, subdivision (a)(3), requires the low evidentiary showing of some physical abode in the county that is more than a temporary visit. (SER 89, ER, 151.) However, Raulinaitis's interpretation of the term "resident" in California Penal Code section 26150 (1) conflicts with California case law and statutory usage in which the term "resident" and "domicile" are commonly used interchangeably; (2) conflicts with California case law and statute that a person can only have one domicile, and that to effect a change, there must be abandonment of one location to effect a change to another; and (3) conflicts with applicable California legislative history for Penal Code section 26150, which makes it clear that the residency requirement was added to prevent forum shopping for a CCW license and to ensure via the nexus of residency that the deciding official was in the position to be well informed to scrutinize a CCW application.

Moreover, the uncontroverted record below is replete with evidence that Raulinaitis's domicile with his wife was located in Santa Clarita in Los Angeles County and that Raulinaitis never abandoned that domicile with the permanent intention to reside in a one-bedroom condominium in Oxnard in Ventura County.

Raulinaitis only applied for a CCW license in Ventura County after he was denied by Los Angeles County. The district court relied upon evidence from Raulinaitis's binding stipulation of facts, Raulinaitis's interview admissions, Raulinaitis's conflicting declaration statements, the Sheriff's surveillance and investigation and Raulinaitis's listing of his Oxnard condominium for sale to find no genuine dispute of material fact that Raulinaitis was not a resident of Ventura County.

The Sheriff's application of the residency requirement of California Penal Code section 26150, subdivision (a)(3), does not adversely impact any Second Amendment right of Raulinaitis. The Second Amendment is not infringed by a residency screening requirement for CCW applications, nor does it protect a CCW applicant's right to forum shop for a CCW license. Moreover, even if enforcement of a statutory county residency requirement were deemed to impact a Second Amendment right, the Sheriff's application of the county residency requirement would easily survive review under intermediate scrutiny.

## V

## STATEMENT OF FACTS

### A.    The District Court Relied on the Parties' Binding Factual Stipulations

On May 28, 2013, the parties filed a joint case management statement and factual stipulation which sets forth the following facts deemed admitted by all parties:

a. Raulinaitis applied for and was denied a permit for a concealed weapon by the Sheriff because he was not a resident of Ventura County.

b. The Sheriff defines residence as: The County in which a person spends most of his or her time and conducts most of his or her activities.

c. The Sheriff determined that Raulinaitis did not meet the standards for this definition, and Raulinaitis agrees that he does not meet the terms of this definition.

d. Raulinaitis owns and maintains a home in Ventura County. Raulinaitis also maintains homes in Los Angeles and San Bernardino counties. (SER 86-87.)

The parties also earlier stipulated to these same facts. (SER 89.) The district court relied on the parties' stipulation regarding these facts in its first summary judgment order, and neither party sought to be relieved from such factual stipulations. (ER 140.) The district court also found the parties' earlier factual stipulations binding in ruling on Raulinaitis's second motion for summary judgment. (ER 140.)

**B.** **Evidence of Residency From Raulinaitis's First Declaration**

Raulinaitis's first declaration in support of summary judgment is dated June 3, 2013. (SER 77.) In that declaration, Raulinaitis stated that on June 2012, Raulinaitis purchased a home in the City of Oxnard, and moved his personal effects into the Oxnard home. (SER 76, First Raulinaitis Decl., ¶ 2.) Other than

family members and invited guests, no one uses the Oxnard home. (SER 76, First Raulinaitis Decl., ¶ 2.) Raulinaitis maintains and pays for utilities for the Oxnard home. (SER 76, First Raulinaitis Decl., ¶ 2.) On an unspecified date after June 2012, Raulinaitis updated his voter registration to Ventura County, and intends to vote in the next election in Ventura County. (SER 77, First Raulinaitis Decl., ¶ 3.) Raulinaitis considers the Oxnard home to be "one of [his] permanent homes" and a place to which he intends always to return and frequently does return. (SER 77, First Raulinaitis Decl., ¶ 4.) Raulinaitis owns homes in two other counties and frequently travels for business and pleasure. (SER 77, First Raulinaitis Decl., ¶ 4.) Because Raulinaitis's personal and professional life is of a "variable nature," "it is impossible" for Raulinaitis to pick a county in California as the one in which Raulinaitis spends the majority of his time. (SER 77, First Raulinaitis Decl., ¶ 6.) Raulinaitis asserts that his declaration combined with the "physical acts of moving and legal act of registering to vote" are sufficient to prove he is a resident of Ventura County. (SER 77, First Raulinaitis Decl., ¶ 7.)

## C.     Evidence of Residency From Raulinaitis's Second Declaration

Raulinaitis's second declaration in support of summary judgment is dated May 12, 2014. (ER 25.) Raulinaitis asserted he is "a resident and domiciliary of Ventura [County] where I maintain my primary home in and am registered with the DMV as my residence and with the Secretary of State to vote [*sic*]." (ER 24,

Second Raulinaitis Decl., ¶ 2.)  Raulinaitis stated that if he is ever absent from his Ventura County home, it remains his permanent home where he plans on returning.  (ER 24, Second Ralinaitis Decl., ¶ 2.)  Raulinaitis asserted, "Ventura is the place where I remain when not called elsewhere for labor or other special or temporary purpose, and to which I return in seasons of repose."  (ER 25, Second Ralinaitis Decl., ¶ 3.)  Raulinaitis intends to remain in Ventura County and, whenever he is absent, he has the intention of returning.  (ER 25, Second Raulinaitis Decl., ¶ 4.)

Whereas on June 3, 2013, in his first declaration, Raulinaitis stated under oath that his Oxnard home was "one of" his several "permanent" homes and not his sole permanent home and that he does not spend the majority of his time at any of this three homes, Raulinaitis contended otherwise in his May 12, 2014 declaration.  (ER 142.)  Raulinaitis did not assert that his factual circumstances had changed since the June 3, 2013, date he signed his first declaration, nor did he explain the inconsistency between his two sworn statements.  (ER 142, SER, 24-25, Second Raulinaitis Decl.)

**D.    Evidence of Residency From the Sheriff's Investigation**

**1.  Raulinaitis's First CCW Application**

Deputy Sheriff Daniel Gonzales ("Deputy Gonzales") of the Ventura County Sheriff's Office was responsible for investigating Raulinaitis's first CCW

application received on January 15, 2013.  (SER 69; First Gonzales Decl., ¶¶ 2-4, ER 49, Second Gonzales Decl., ¶¶ 2-4.)  Raulinaitis's first CCW application listed an address for an Oxnard condominium as Raulinaitis's residence address, a Burbank business address as Raulinaitis's mailing address, and a Santa Clarita home address as Raulinaitis's wife's address.  (SER 71, First Gonzales Decl., 13-14, Exh. I, 2SER 131; ER 50, Second Gonzales Decl., ¶¶ 11-12.)

At his February 20, 2013, interview with Deputy Gonzales, Raulinaitis stated that he had been living at his home in Santa Clarita, located in Los Angeles County, for the previous four months "almost all the time."  (SER 70; First Gonzales Decl., ¶ 10, ER 49-50, Second Gonzales Decl., ¶ 8, 2SER 113, Exh. C, p. 6.)  Raulinaitis stated that he was employed as a contractor, broker and attorney; his office was in Burbank; but most of his work involved contracting which he performed "all over" in multiple California counties.  (SER 70, First Gonzales Decl., ¶ 10, 2SER 111-112, Exh. C, pp. 4-5.)  Raulinaitis stated that his wife lived at their Santa Clarita home which they were remodeling and planning to place on the rental market.  (SER 70, First Gonzales Decl., ¶ 10, 2SER 110 & 112, Exh. C, pp. 4-5.)  Raulinaitis stated that his son lived at the Oxnard condominium with Raulinaitis, and Raulinaitis's wife "spent the better part of the summer" at the one-bedroom Oxnard condominium with Raulinaitis and his son because it is cooler than their Santa Clarita home.  (SER 70, First Gonzales Decl., ¶ 10, 2SER 112,

Exh. C, p. 5.) During the winter, Raulinaitis and his wife "go a lot" to their Big Bear home in San Bernardino County. (SER 70, First Gonzales Decl., ¶ 10, 2SER 112, Exh. C, p. 5.) When asked how much time he had spent at the Oxnard condominium during the past month, Raulinaitis replied, "probably just several days," because he had been spending more time in Santa Clarita while working there. (SER 70, First Gonzales Decl., ¶ 10, 2SER 112, Exh. C, p. 5.) Raulinaitis stated that where he lives "varies"; he spends time at the Santa Clarita house; in the summer, he spends time in the Oxnard condominium; and in the winter, he and his wife "go a lot" to their Big Bear home. (SER 70, First Gonzales Decl., ¶ 10, 2SER 112, Exh. C, p. 5.)

At the time of Deputy Gonzales's investigation of Raulinaitis's first CCW application, Raulinaitis's driver's license reflected his address as in Burbank (142 West Verdugo Avenue), which turned out to be his place of business. (SER 70; First Gonzales Decl., ¶ 11, 2SER 117, Exh. D., 2SER 136, Exh. J, ER 49, Second Gonzales Decl., ¶ 9.) A check of Department of Motor Vehicle ("DMV") registration records revealed that two of Raulinaitis's vehicles were registered to his residence in Santa Clarita (Los Angeles County) and two were registered at his work address in Burbank (Los Angeles County). (SER 71; First Gonzales Decl., ¶ 12, 2SER 118-125, Exhs. E-H, ER 50, Second Gonzales Decl., ¶ 10.)

**2. The Sheriff's Surveillance of Raulinaitis after Raulinaitis's First CCW Application**

Deputy Gonzales conducted surveillance in an unmarked police vehicle at the Santa Clarita address of Raulinaitis on January 28, 2013, observed Raulinaitis leave from the Santa Clarita residence at 6:43 a.m., and followed Raulinaitis to his work address in Burbank. (SER 71-72; First Gonzales Decl., ¶¶ 17-23, ER 51, Second Gonzales Decl., ¶¶ 15-21.) Deputy Gonzales's fellow investigator, Detective Ed Jones, observed Raulinaitis departing from the same Santa Clarita address on February 1, 2013, at 6:42 a.m. (SER 72; First Gonzales Decl., ¶¶ 24-27, ER 51-52, Second Gonzales Decl., ¶¶ 22-25.) Deputy Gonzales learned in his investigation that Raulinaitis had sued the Los Angeles County Sheriff's Department for denying him a CCW license about a year and a half earlier; Raulinaitis would have needed to claim Los Angeles County residency to qualify for such a CCW license. (SER 71, First Gonzales Decl., ¶ 15, ER 50, Second Gonzales Decl., ¶ 13, SER 92-99, docket.)

Raulinaitis's only claim to Ventura County residency was that he owned a condominium in Oxnard. (SER 73, First Gonzales Decl., ¶ 29, ER 52, Second Gonzales Decl., ¶ 27.) During his CCW interview, Raulinaitis confirmed the Oxnard condominium had one bedroom and stated that he slept in the bedroom while his son, who attends college at California State University at Channel

Islands (and had one more semester before graduating), slept in the living room. (SER 70, First Raulinaitis Decl., ¶ 10, SER 110, 112-113, Exh. C.) However, when Deputy Gonzales spoke with the property manager of the Oxnard condominium, the property manager told him she had spoken with Raulinaitis's wife who said Raulinaitis and his wife were renting the condominium to their son Jason. (SER 73, First Gonzales Decl., ¶ 30, ER 52, Second Gonzales Decl., ¶ 28.)

Raulinaitis registered to vote in Ventura County on February 20, 2013, the same date that Deputy Gonzales interviewed Raulinaitis; prior to his CCW interview date, Raulinaitis was not registered to vote in Ventura County. (SER 73, First Gonzales Decl., ¶ 31, ER 52, Second Gonzales Decl., ¶ 29.) Deputy Gonzales placed minimal significance on Raulinaitis registering to vote in Ventura County because the Clerk-Recorder/Registrar of Voters in Ventura County does not request proof of identification or residency. (ER 58-59, Third Gonzales Decl., ¶ 42.)

From his investigation of Raulinaitis's first CCW application, it was not reasonable for Deputy Gonzales to conclude that Raulinaitis was a resident of Ventura County. (SER 73, First Gonzales Decl., ¶ 32, ER 52, Second Gonzales Decl., ¶ 30.)

### 3. **Raulinaitis's Second CCW Application**

On March 26, 2014, Deputy Gonzales received a new CCW application from Raulinaitis, and Deputy Gonzales investigated this second CCW application as well. (ER 53, Third Gonzales Decl., ¶¶ 4-5.)

### 4. **The Sheriff's Surveillance of Raulinaitis After His Second CCW Application**

On April 16, 2014, from 5:30 a.m. through 7:30 a.m., Deputy Gonzales conducted surveillance at the Oxnard condominium complex which Raulinaitis identified as his home address on his new CCW application, and did not see Raulinaitis or any of the vehicles registered to him or his wife. (ER 53-54, Third Gonzales Decl., ¶¶ 7-9.) On April 17, 2014, Deputy Gonzales conducted surveillance at the same Oxnard condominium complex between 5:25 a.m. and 7:30 a.m. and did not see Raulinaitis or any of the vehicles registered to him. (ER 54, Third Gonzales Decl., ¶¶ 10-13.) On April 18, 2014, Deputy Gonzales conducted surveillance at the same Oxnard condominium complex between 5:27 a.m. and 7:00 a.m. and did not see Raulinaitis or any of the vehicles registered to him or his wife. (ER 54, Third Gonzales Decl., ¶¶ 14-16.)

On April 21, 2014, Deputy Gonzales and Detective Jones conducted surveillance at the Santa Clarita home address in Los Angeles County, which Raulinaitis had listed as his wife's address on his CCW application, between

5:40 a.m. and 7:15 a.m. and observed Raulinaitis driving away from the Santa

Clarita residence in a vehicle belonging to Raulinaitis.  (ER 55, Third Gonzales

Decl., ¶¶ 17-20.)  On April 22, 2014, Deputy Gonzales and Detective Jones

conducted morning surveillance at the Santa Clarita residence and saw Raulinaitis

depart the Santa Clarita residence at 6:51 a.m. in a vehicle belonging to

Raulinaitis.  (ER 55, Third Gonzales Decl., ¶¶ 21-22.)  On April 23, 2014, Deputy

Gonzales and Detective Jones again conducted surveillance of the Santa Clarita

residence and observed Raulinaitis departing from the residence at 6:51 a.m.,

driving at a slow rate of speed unlike his typical driving behavior, while he was

looking at both Deputy Gonzales and Detective Jones.  (ER 55-56, Third Gonzales

Decl. ¶¶ 23-25.)  The next day, when Deputy Gonzales and Detective Jones again

conducted surveillance at the Santa Clarita residence, and Raulinaitis was not

there.  (ER 56, Third Gonzales Decl., ¶ 25.)

On May 15, 2014, at approximately 4:00 p.m., Detective Jones and Deputy

Gonzales checked the parking structure of the Oxnard condominium complex and

none of Raulinaitis's or Raulinaitis's wife's vehicles were present.  (ER 56, Third

Gonzales Decl., ¶¶ 26- 27.)

On May 15, 2014, Detective Jones and Deputy Gonzales drove to the Santa

Clarita residence, observed Raulinaitis's vehicle parked in the driveway,

emanating heat from the front engine grill at 6:33 p.m., and took a photograph of

the parked vehicle in the driveway.  (ER 56, Third Gonzales Decl., ¶¶ 28-30,

Exh. C, ER 62.)

On May 15, 2014, Deputy Gonzales showed a Santa Clarita neighbor the

DMV photograph of Raulinaitis, and the neighbor recognized Raulinaitis and

stated that they had been neighbors for 14 years.  (ER 56, Third Gonzales Decl.,

¶ 31.)  On May 15, 2014, two other persons living in a nearby Santa Clarita

residence also identified Raulinaitis as their neighbor and pointed to his house.

(ER 57, Third Gonzales Decl., ¶ 32.)  Another Santa Clarita neighbor when shown

the DMV photograph of Raulinaitis identified him and stated he saw Raulinaitis

about every other day and waved to him in greeting and that he was good friends

with Raulinaitis's son as that they grew up together.  (ER 57, Third Gonzales

Decl., ¶ 33.)  This neighbor's mother informed Deputy Gonzales that she often

saw Raulinaitis and had socialized with him in March or April 2014 at a Santa

Clarita neighborhood function, and identified Raulinaitis's car.  (ER 57, Third

Gonzales Decl., ¶ 34.)  Yet another Santa Clarita neighbor when shown

Raulinaitis's DMV photo stated that she sees him once or twice a week, identified

Raulinaitis's vehicle, and stated she observed Raulinaitis's vehicle parked in the

driveway "Every day."  (ER 57-58, Third Gonzales Decl., ¶ 37.)  Another Santa

Clarita neighbor interviewed who worked as a Los Angeles County sheriff's

deputy recognized Raulinaitis from his DMV photo, pointed to the Santa Clarita

residence, and said he saw Raulinaitis on a regular basis.  (ER 58, Third Gonzales Decl., ¶ 38.)

The Thousand Oaks special enforcement unit of the Ventura County Sheriff's Office located Raulinaitis's Twitter page which identified a Santa Clarita location for Raulinaitis.  (ER 58, Third Gonzales Decl., ¶ 40.)  The district court viewed the screen capture of that Twitter page listing Santa Clarita as Raulinaitis's location on September 18, 2014.  (ER 149, fn. 13.)  When the district court reviewed the Twitter page on September 30, 2014, Raulinaitis had changed his location to Channel Islands, California.  (ER 149, fn. 13.)

Based on the entirety of his investigation, Deputy Gonzales concluded that Raulinaitis's residence, or at a minimum his primary residence, was in Santa Clarita in Los Angeles County, contradicting Raulinaitis's second CCW application in which he claimed to reside in Oxnard.  (ER 58, Third Gonzales Decl., ¶ 41.)

**E.**     **Raulinaitis's Listing of the Oxnard Condominium for Sale and No Evidence of Raulinaitis's Estrangement From His Wife**

Subsequent to Deputy Gonzales' investigation, the district court noted that an internet search viewed by the court on September 23 and 30, 2014, indicated that a property at the same address as Raulinaitis's claimed Oxnard residence (3101 Peninsula Road, Unit 205, Oxnard, California 93035) had been placed on

16

the market for sale, with the listing originally received on July 31, 2014, and an open house scheduled for September 28, 2014; the court confirmed the listing for sale by viewing a Coldwell Banker listing as well as multiple entries on such other well-known real estate websites as, inter alia, zillow.com, redfin.com and trulia.com.  (ER 167, fn. 18.)

The district court found that Raulinaitis's placing his Oxnard condominium on the market so closely after he submitted his May 12, 2014, declaration belied Raulinaitis's sworn assertions regarding the permanent nature of his Oxnard condominium as his domicile and his declared intent at all times to return to, and remain at, the Oxnard condominium.  (ER 167, fn. 18.)

Given no suggestion by Raulinaitis that he was estranged from his wife, the district court found it "odd" that Raulinaitis alleged the one-bedroom condominium in Oxnard shared with his adult son was his permanent home, not his wife's home, located in Santa Clarita, almost 50 miles from Oxnard (a considerable distance given Southern California traffic).  (ER 168, fn. 19.)

## F.     Raulinaitis's Failure to Dispute Any of the Factual Assertions Set Forth in the Sheriff's Statement of Uncontroverted Facts

The district court noted that Raulinaitis failed to oppose the Sheriff's motion for summary judgment with a separate document containing a statement of genuine issues setting forth all material facts to which Raulinaitis contended there

was a genuine dispute necessary to be litigated.  (SER 6.)  Based on Raulinaitis's

failure to dispute the Sheriff's factual assertions, the district court assumed such

facts claimed and adequately supported by the Sheriff's statement of

uncontroverted facts and conclusions of law, dated June 3, 2014 (ER 65-77), to be

admitted by Raulinaitis to exist without controversy in accordance with local rule

56-3.  (SER 6.)  The district court also considered the evidence submitted by the

parties in connection with Raulinaitis's first motion for summary judgment.  (ER

141.)  The district court did not consider as evidence numerous unsworn factual

assertions lacking any evidentiary support made by Raulinaitis's counsel.  (ER

141, fn. 4.)

# VI

## <u>STANDARD OF REVIEW</u>

This court reviews a district court's grant or denial of a motion for summary

judgment de novo.  (*Henderson v. City of Simi Valley* (9th Cir. 2002) 305 F.3d

1052, 1055 ("*Henderson*").)  Summary judgment is appropriate when, viewing the

evidence in the light most favorable to the nonmoving party, the district court

correctly applied relevant substantive law and there are no genuine issues of

material fact in dispute.  (*Clark v. City of Lakewood* (9th Cir. 2001) 259 F.3d 996,

1004.)  A fact is material if it could affect the outcome of the suit under governing

law.  (*Hauk v. JP Morgan Chase Bank USA* (9th Cir. 2009) 552 F.3d 1114, 1124.)

This court reviews whether specific facts show that there is a genuine issue for trial based on affidavits or other evidence permitted by the Federal Rules of Civil Procedure.  (*Henderson, supra*, 305 F.3d at pp. 1055-1056.)  This court may also affirm summary judgment on any ground supported by the record, whether or not relied upon by the district court.  (*Karl Storz Endoscopy America, Inc. v. Surgical Technologies, Inc.* (9th Cir. 2002) 285 F.3d 848, 855.)

## VII

## ARGUMENT

## A.   The Sheriff's Interpretation of the County Residency Requirement Comports with Case Law, Common Statutory Usage and Legislative History

 Penal Code section 26150, subdivision (a)(3), requires that an applicant for a CCW license either prove to the sheriff that he is a county resident or that he maintains a principal place of employment in the county while spending a substantial period of time in that place of employment.

Penal Code section 26150 does not contain a definition for "resident," nor is such a definition set forth in part 6 (Control of Deadly Weapons), title 4 (Firearms), division 5 (Carrying Firearms), and chapter 4 (License to Carry a Pistol, etc.) of the California Penal Code, of which Penal Code section 26150 is a part.  However, part 6 contains a definition for the alternate "principal place of employment or business" ground, in California Penal Code section 17020, and

defines "principal place of employment or business" in a manner similar to section 26150, by requiring the applicant to be "physically present in the jurisdiction during a substantial part of the applicant's working hours for purposes of that employment or business."

Counsel has not located any administrative regulations or California court decision defining the term "resident" as used in Penal Code section 26150. (Cf. 62 Ops.Cal.Atty.Gen 508 (1979) WL 29270 at p. 3 [opining that residency requirement for CCW license is "based upon the assumption that a local police agency would be best equipped to determine the good moral character of the applicant, the necessity for the license, and the restrictions, if any, which should be placed on it"].)

1. **California Statutes Frequently Use the Terms "Resident" and "Domicile" Interchangeably**

State and federal cases have noted that California statutes frequently use the term "resident" and "domicile" interchangeably. (*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.* (C.D.Cal. 2008) 568 F.Supp.2d 1152, 1179 ["in many statutes, 'residence' is frequently construed to mean domicile and the terms are often used synonymously," quoting *Whittel v. Franchise Tax Bd.* (1964) 231 Cal.App.2d 278, 284, and citing the following California statutes: Gov. Code,

§§ 243, 244; Prob. Code, § 301; Civ. Code, § 128; & Code Civ. Proc., §§ 395, 417] aff'd by (9th Cir. 2012) 692 F.3d 983; *In re Marriage of Thornton* (1982) 135 Cal.App.3d 500, 507 ("*Thornton*") [defining resident for purposes of dissolution of marriage, stating, "It is well settled in California that the term 'residence' as used in Civil Code section 4530, subdivision (a), is synonymous with 'domicile.'"]; *Burt v. Scarborough* (1961) 56 Cal.2d 817, 820-821 [noting historical practice of California courts to construe "residence" to mean "domicile"]; *Penn. Mut. Life Ins. Co. v. Fields* (S.D. Cal. 1984) 81 F.Supp. 54, 57 ["as a rule [in California statutes dealing with marriage and divorce], whenever 'residence' is mentioned it is evident that a residence which has risen to the dignity of 'domicile' is meant"]; *Fenton v. Board of Directors* (1984) 156 Cal.App.3d 1107, 1113-1115 [affirming trial court's interpretation of term "residing" used in Gov. Code, § 61200 to mean "domiciled"]; *In re Marriage of Amezquita & Archuleta* (2002) 101 Cal.App.4th 1415, 1419 [interpreting "residence" under Fam. Code, § 4962 as "domicile"].)

## 2. Domicile Requires a Combination of Actual Presence and Intent

Further, California case law holds that residency (meaning domiciliary) requires a combination of both actual presence and intention. *Thornton* observed, "merely purchasing a home . . . is not sufficient to demonstrate intent to acquire a domicile if contradicted by other substantial evidence of intent." (*Thornton,*

*supra,* 135 Cal.App.3d at pp. 508-508; see also *Aldabe v. Aldabe* (1962) 209 Cal.App.2d 453, 466 ["To establish a domicile the union of act and intent is necessary. . . 'A man's home is where he makes it, not where he would like to have it.'"]; *Eriksen v. Eriksen* (1943) 57 Cal.App.2d 532, 535-536 [court noted need for corroboration of residency where essential, and stated, "In order to effect a change of residence, there must be a concurrence in the act of abandonment of one residence with the intent to establish a new residence elsewhere."].)  In *State of Texas v. State of Florida* (1939) 306 U.S. 398, 424-27 [59 S.Ct. 563, 83 L.Ed. 817], the United States Supreme Court noted that self-serving declarations of intent with respect to domicile and/or permanent residence for tax purposes do not control when the facts show otherwise.  Under California law, a person may own multiple "residences" but can have only one "domicile."  (*Walters v. Weed* (1983) 45 Cal.3d 1, 6-8.)

Government Code sections 243 and 244 treat the concept of "residence" akin to that of "domicile."  Government Code section 243 states:  "Every person has, in law, a residence."  Government Code section 244 states:  "In determining the place of residence the following rules shall be observed:

"(a)  It is the place where one remains when not called elsewhere for labor or other special or temporary

purpose, and to which he or she returns in seasons of
repose.

"(b)  There can only be one residence.

"(c)  A residence cannot be lost until another is gained.

". . .

"(f)  The residence can be changed only by the union of
act and intent.

"(g)  A married person shall have the right to retain his
or her legal residence in the State of California
notwithstanding the legal residence or domicile of his or
her spouse."

In *Smith v. Smith* (1955) 45 Cal.2d 235, 239 ("*Smith*"), the California
Supreme Court interpreted the term "resident" that was not defined by the statute
at issue and stated:

"As used in [Code of Civil Procedure] section 417, the
word 'resident' has not been specifically defined by code
or judicial decision and its meaning must therefore be
determined here.  Courts and legal writers usually
distinguish 'domicile' and 'residence,' so that 'domicile'
is the one location with which for legal purposes a

person is considered to have the most settled and
permanent connection, the place where he intends to
remain and to which, whenever he is absent, he has the
intention of returning, but which the law may also assign
to him constructively; whereas 'residence' connotes any
factual place of abode of some permanency more than a
mere temporary sojourn.  'Domicile' normally is the
more comprehensive term, in that it includes both the *act*
of residence and an *intention* to remain; a person may
have only one domicile at a given time, but he may have
more than one physical residence separate from his
domicile, and at the same time. . . .  But statutes do not
always make this distinction in the employment of these
words.  They frequently use 'residence' and 'resident' in
the legal meaning of 'domicile' and 'domiciliary,' and at
other times in the meaning of factual residence or in still
other shades of meaning. . . .  For example, in our codes
'residence' is used as synonymous with domicile in the
following statutes:  sections 243 and 244 of the
Government Code, giving the basic rules generally

regarded as applicable to domicile." (Emphasis in original.)

*Smith* concluded: "Residence, as used in the law, is a most elusive and indefinite term. It has been variously defined. . . . To determine its meaning, it is necessary to consider the purpose of the act." (*Smith, supra*, 45 Cal.2d at p. 240.)

**3. Legislative History Supports the Sheriff's Interpretation of the Residency Requirement**

Pursuant to the Deadly Weapons Recodification Act of 2010, the CCW statutory provisions were recodified effective January 1, 2012. The statutory precursor to California Penal Code section 26150 was California Penal Code section 12050. In 1969, Senate Bill 1272 amended section 12050 to add the requirement that the applicant be "a resident of the county." (Stats. 196, c. 118, p. 2318, § 1.) The Legislative history of Senate Bill 1272 shows that a residency requirement was added to prevent forum shopping for a CCW license, and to protect public safety by ensuring that the local law enforcement chief in the position to be the most knowledgeable regarding an applicant's qualifications would be the one to evaluate and take action on a CCW application.

The Attorney General sponsored Senate Bill 1272 to "stop 'shopping' for permits throughout the state."[1/] (See Enrolled Bill Memorandum to Governor for SB 1272 dated August 20, 1969 [signed by the Legislative Secretary with a recommendation to "Approve"]; see also California Bill Analysis, A.B. 2022 Sen., August 19, 1998 ["The 1969 legislation also precluded chiefs and sheriffs from issuing licenses to out-of-county residents. The 1969 limitation on the issuance of out-of-county residents may be been designed to prevent forum shopping."].)

The California Attorney General and the Assistant Attorney General sent then Governor Ronald Reagan a memorandum on August 11, 1969, urging him to sign Senate Bill 1272 into law, stating:

> "The purpose of this bill is to curtail the present practice of 'shopping' for concealed weapons permits throughout the state. It is now common practice for citizens to obtain these permits from law enforcement agencies in jurisdictions hundreds of miles from their residence.

> "Senate Bill 1272 would require that an applicant obtain his permit from the sheriff or chief of police

_____

[1/] In its summary judgment order, the district court reviewed legislative history (ER 156-158) that was quoted by the Sheriff in its written briefing. (ER 36-38.)

within the county of his residence.  It would also help

insure that permits are not granted improvidently.  Law

enforcement agencies near the residence of the applicant

are obviously in a much better position to evaluate the

background, reputation, and need for a weapon, of an

applicant.

    "Permits to carry concealed weapons should, of

course, be restricted to those who are stable and have

demonstrated a genuine need to carry a concealed

weapon.  This bill will help insure that the issuance of

these permits is confined to this class of persons."

On August 8, 1969, the District Attorney of Alameda County wrote to

Governor Reagan on behalf of the California Peace Officers' Association and the

District Attorneys' Association of California and urged the Governor to approve

Senate Bill 1272, stating,

    "This requirement of residency will assist law

enforcement in effectively ascertaining just who within

their county does possess such a permit, and these are the

officials who are most likely to know whether the

applicant does in fact possess that good moral character

which must be demonstrated in order to obtain such a

license."

Based on the legislative history of Senate Bill 1272, the added requirement that a CCW applicant be a county "resident" appears to require the applicant to prove "domicile" – that the applicant's permanent home is in the county of application, as the local official in the county of domicile is best positioned to engage in the informed review of a CCW application, including crucial considerations of an applicant's moral character.

Furthermore, the provisions of California Penal Code section 26210, subdivision (d), provide that a CCW license granted on the basis of county residency shall expire within 90 days of the CCW applicant moving from the county of issuance, underscoring the importance placed by the Legislature over local control and oversight of CCW licensees.

**4. The Sheriff's Interpretation of Residency Complying with Common Statutory Usage, Pertinent Case Law and Legislative History Protects Public Safety**

Raulinaitis's opening brief largely ignores California case law holding that residence and domicile are commonly used interchangeably, case law and statute providing that there must be a union of act and intent, and the legislative history of California Penal Code section 26150 pointing to the purpose of adding a residency

requirement. Although Raulinaitis argues that the Sheriff's definition of "resident" is not consistent with California Penal Code section 26150, subdivision (a), Raulinaitis's legal analysis fails to show that the Sheriff's interpretation of "resident" violates California law.

The Sheriff interprets "resident" under California Penal Code section 26150 to mean a person who spends most of his time and conducts most of his activities in Ventura County – an interpretation that comports with the concept of "domicile" in California case law and the requirement that there be a union of act and intent. The Sheriff's interpretation is also consistent with the legislative history of California Penal Code section 26150 indicating that the residency requirement was intended to prevent forum shopping and to ensure that CCW applications were reviewed by a knowledgeable local official.

California is a vast state with a population of over 38 million people. The statutory interpretation advanced by Raulinaitis would permit persons able to afford many residences throughout California to apply for a CCW license in a jurisdiction in which they do not permanently reside, and have only a tangential tie, and thus thwart law enforcement scrutiny of a CCW applicant's moral character. Since a CCW license granted to a county resident by a sheriff enables

the licensee to carry a concealed weapon in all California counties,[2/] the public

safety interests of the entire state are served by having the most knowledgeable

local official scrutinize a CCW applicant's moral character.

It is not unusual for local sheriff departments to complete field identification

cards regarding individuals encountered on local patrol who seem suspicious or

out of place, and these field identification cards are stored for use as a future factor

in law enforcement decisions.  (ER 45.)  The local sheriff has unique and

unfettered access to these field identification cards which are not readily possessed

by other jurisdictions.  (ER 45.)  Additionally local sheriffs have resources to

conduct surveillance of a limited number of local residents.  (ER 45.)  A sheriff

located in one county is not positioned to conduct effective surveillance on a CCW

applicant with predominant residential ties to another county.  The residency

requirement of Penal Code section 26150, subdivision (a)(3), reasonably requires

an applicant to establish residency akin to domicile before pursuing an application

based on residency.  No public policy interests are served by requiring a local

sheriff to pass muster on someone who is rarely in the county and does not

permanently reside there.

---

[2/]  However, if place of employment or business, rather than county residency, is the basis for issuance of a license under Penal Code section 26150, the CCW license shall be valid only in the county in which the license was originally issued.  (Pen. Code, § 26220, subd. (b).)

**B.** **The Record Below Does Not Give Rise to a Genuine Dispute of Material Fact that Raulinaitis Is a Resident of Ventura County**

Because Raulinaitis stipulates he does not meet the Sheriff's interpretation of the residency requirement (SER, 86-87), this court may simply affirm the district court's grant of summary judgment for the Sheriff on that basis if it finds the Sheriff's statutory interpretation of California Penal Code section 26150, subdivision (a)(3), comports with California law.

Furthermore, Raulinaitis's binding stipulations notwithstanding, copious additional evidence – including, but not limited to, Raulinaitis's admissions in his first and second declarations; Raulinaitis's unexplained contradictory statements; Raulinaitis's admissions in his CCW interview; the Sheriff's surveillance at the Santa Clarita and Oxnard addresses after Raulinaitis's first and second CCW applications; the Sheriff's interviews of Raulinaitis's Santa Clarita neighbors; the Sheriff's interview of the Oxnard property manager; the Sheriff's driver's license address identification; Raulinaitis's vehicle registration address documentation; Raulinaitis's Twitter account location documentation; Raulinaitis's forum shopping in Ventura County for a CCW license after denial of a Los Angeles County CCW application; Raulinaitis's tenuous tie to Ventura County based on temporary college housing for his son, Raulinaitis's belated registration to vote in Ventura County; and Raulinaitis's listing of his Oxnard condominium for sale –

also demonstrates that Raulinaitis does not raise a genuine dispute of material fact that he is a resident of Ventura County within the meaning of California Penal Code section 26150.

The evidentiary record does not support a finding that Raulinaitis abandoned his Santa Clarita home as his residence and replaced it with the Oxnard condominium as his residence, much less his domicile. Ample uncontroverted evidence supports the conclusion that Raulinaitis remains a resident of Los Angeles County.

## C. The Sheriff Did Not Violate the Second Amendment

### 1. Enforcement of a Statutory County Residency Screening Requirement Does Not Implicate Second Amendment Rights

*District of Columbia v. Heller* recognized "the right of law-abiding, responsible citizens to use arms in the defense of hearth and home." (*District of Columbia v. Heller* (2008) 554 U.S. 570, 635 [128 S.Ct. 2783, 171 L.Ed.2d 637] ("*Heller*"); *McDonald v. City of Chicago* (2010) 561 U.S. 742, 771 [130 S.Ct. 3020, 177 L.Ed.2d 894] ("*McDonald*") [right recognized by *Heller* fully applicable to States].)

However, *Heller* did not hold that there was a Second Amendment right of persons to carry concealed weapons in public. Although *Heller* found a right to

possess and carry weapons "in case of confrontation," *Heller* only held that right applied in the home.  (*Heller*, *supra*, 554 U.S. at p. 592.)

Insofar as *Heller* addressed concealed weapon laws at all, *Heller* merely stated:

> "Like most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . .  For example, *the majority of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment and state analogues.*"  (*Heller, supra*, 554 U.S. at p. 626, italics added.)

Previously, the Supreme Court has stated in dicta that the Second Amendment right is not infringed by laws prohibiting the carrying of concealed weapons.  (*Robertson v. Baldwin* (1897) 165 U.S. 275, 281-282 [17 S.Ct. 236, 41 L.Ed. 715] ("*Robertson*") [discussing "well-recognized" exceptions to Bill of

Rights, including that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons"].)

Lower courts have noted that *Heller* has left many constitutional issues unresolved, and have issued varying opinions regarding whether the Second Amendment reaches a right to carry firearm in public for self-defense. (See, e.g., *Nichols v. Brown* (C.D. Cal. 2013) 945 F.Supp.2d 1079, 1098-1101 [due to unsettled state of law on right to open carry firearm in public, qualified immunity applies on rule 12(b)(6) motion to dismiss plaintiff's damage claims against police chief and two officers on claimed Second Amendment violations]; *Dorr v. Weber* (N.D. Iowa 2010) 741 F.Supp.2d 993, 1005-1006 [sheriff entitled to qualified immunity for denying concealed weapons permit because "a right to carry a concealed weapon under the Second Amendment has not been recognized to date"]; *U.S. v. Masciandaro* (4th Cir. 2011) 638 F.3d 458, 475 ["There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation."]; *Embody v. Ward* (6th Cir. 2012) 695 F.3d 577, 581-582 [holding qualified immunity for park ranger because no court has held that Second Amendment encompasses right to bear arms

within state parks]; *Peterson v. Martinez* (10th Cir. 2013) 707 F.3d 1197, 1200

[Second Amendment does not provide right to carry concealed firearm]; *U.S. v.*

*Hart* (D.Mass 2010) 726 F.Supp.2d 56, 60 [*"Heller* does not hold, nor even

suggest, that concealed weapons laws are unconstitutional. . . ."]; *Gamble v. U.S.*

(D.C. Ct. App. 2011) 30 A.3d 161, 164-166 [there is no Second Amendment right

to carry a concealed weapon]; cf. *Moore v. Madigan* (7th Cir. 2012) 702 F.3d 933,

936 ["A right to bear arms [under the Second Amendment] . . . implies a right to

carry a loaded gun outside the home"]; *Kachalsy v. County of Westchester* (2d.

Cir. 2012) 701 F.3d 81, 89, 93 [assuming Second Amendment right to carry

concealed weapon outside home post-*Heller*, but noting, "[w]hat we know from

these decisions is that the Second Amendment guarantees are at their zenith within

the home . . . What we do not know is the scope of the right beyond the home and

the standards for determining when and how the right can be regulated by the

government"]; *Woollard v. Gallagher* (4th Cir. 2013) 712 F.3d 865, 876

[assuming, without deciding, that *Heller* right exists outside of home, but finding

that Maryland's "good-and-substantial-reason requirement passes constitutional

muster under what we have deemed to be the applicable standard-intermediate

scrutiny"]; *Drake v. Filko* (3d Cir. 2013) 724 F.3d 426, 430 ["It remains unsettled

whether the individual right to bear arms for the purpose of self-defense extends

beyond the home."]; and *Hightower v. City of Boston* (1st Cir. 2012) 693 F.3d 61,

74 [revocation of firearms license on basis of false information supplied on application form did not violate Second Amendment, but not answering question of how *Heller* applies to possession of firearms outside the home].)

Were this court to hold, after en banc rehearing of *Peruta v. County of San Diego* (9th Cir. 2014) 742 F.3d 1444, rehearing en banc granted (9th Cir. 2015) 781 F.3d 1106 ("*Peruta*"), that there is a constitutional right under the Second Amendment to carry a concealed weapon in public for self-defense, because of *Heller*'s expansive definition of "arms," such a decision could have the effect of up-ending decades of state legislation criminalizing the possession and/or carrying in public of various forms of concealed weapons. (For examples of such statutes within California, see, e.g., Pen. Code, §§ 21310 [concealed dirk or dagger]; 21810 [metal knuckles]; 20910 [writing pen knife]; 22210 [leaded cane]; and 20510 [cane sword].)

*Heller* made clear that the term "arms" in the Second Amendment applied to more than firearms, and "was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity." (*Heller, supra*, 554 U.S. at p. 581 [128 S.Ct. 2783, 171 L.Ed.2d 637] [discussing example of bows and arrows].) *Heller* noted that the 18th century meaning of arms is no different than the meaning today, and cited with approval, among other definitions, a 1771 definition of "arms" encompassing "any thing that

a man wears for his defence [*sic*], or takes into his hands, or useth in wrath to cast at or strike another." (*Ibid.*) *Heller* held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (*Id.* at p. 582.) However, *Heller* limits the right to keep and bear arms to the sorts of weapons "in common use at the time" and not extending to weapons "not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (*Id.* at pp. 626-627.)

Given *Heller*'s expansive definition of "arms," given previous Supreme Court dicta in *Robertson*, and given the record of decades of state legislation prohibiting and criminalizing the concealed carry of various types of weapons for reasons of public safety, in the absence of contrary guidance from the United States Supreme Court, this court may hold that there is no constitutional right for persons to carry concealed weapons in public for self-defense, and affirm summary judgment for the Sheriff on that basis.

However, even if this court were to recognize a Second Amendment right to carry concealed weapons in public for self-defense, enforcement of a statutory screening requirement to apply in the county in which the CCW applicant has his primary residential nexus does not infringe upon a CCW applicant's Second Amendment rights. The absolute prohibition on firearms invalidated in *Heller* and

*McDonald* is not remotely at issue in this case. A county residency screening requirement for CCW applicants does not curtail a person's right to "keep" or "bear" arms under the Second Amendment. The residency requirement is not a limiting factor on the exercise of Second Amendment rights, for every CCW applicant still has one county in which to apply for a CCW license. A CCW applicant does not have a constitutional right to forum shop for a CCW license, or to apply in a county where the applicant has only tenuous residential ties and the local official is not positioned to effectively review an applicant's moral character.

**2. In Any Event, the Sheriff's Application of California's Statutory Residency Requirement Would Easily Survive Intermediate Scrutiny Review**

In *U.S. v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1136 ("*Chovan*"), involving a Second Amendment challenge to a federal statute barring persons convicted of misdemeanor domestic violence from possessing any firearm for life, this court held that when a challenged law burdens conduct falling within the scope of the Second Amendment, intermediate scrutiny applies to the challenge. Intermediate scrutiny requires: "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." (*Id*. at p. 1139.)

The Sheriff's application of California's statutory residency requirement would easily satisfy intermediate scrutiny under *Chovan*. Unlike keeping a

firearm within one's home for purposes of defense or confrontation, carrying a concealed firearm in public presents a recognized "threat to public order" and is "prohibited as a means of preventing physical harm to persons other than the offender." (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 314, citing *People v. Hale* (1974) 43 Cal.App.3d 343, 356.)

Maintaining public safety and preventing crime are compelling government interests (*United States v. Salerno* (1987) 481 U.S. 739, 750 [107 S.Ct. 2095, 95 L.Ed.2d 697]; *Schall v. Martin* (1984) 467 U.S. 253, 264 [104 S.Ct. 2403, 81 L.Ed.2d 207]), and the regulation of concealed firearms is a critical factor in accomplishing those interests. Given the public safety importance of sheriff review of a CCW applicant's "good moral character" under California Penal Code section 26150, subdivision (a)(1), there is a direct nexus between public safety and requiring a CCW applicant to apply in the county where the applicant has the most permanent ties of residency and where the reviewing official is best positioned to scrutinize an applicant's moral character.

# VIII

## CONCLUSION

For the foregoing reasons, this court should affirm the district court's grant

of summary judgment to the Sheriff.

Respectfully submitted,
LEROY SMITH
County Counsel, County of Ventura

Date:  December 9, 2015          /s/  Marina Porche_____
                                  MARINA PORCHE, CSB # 162809
                                  Assistant County Counsel

                                  Attorneys for Defendant-Appellee
                                  Ventura County Sheriff's Department

# STATEMENT OF RELATED CASES

Previously, Raulinaitis sent this court a letter dated June 29, 2015, which this court construed as a motion to stay appellate proceedings pending the Ninth Circuit's en banc review of *Peruta v. County of San Diego* (9th Cir. 2014) 742 F.3d 1444, rehearing en banc granted (9th Cir. 2015) 781 F.3d 1106 ("*Peruta*"), and which motion this court granted. The district court's ruling granting Sheriff summary judgment also made repeated reference to the *Peruta* holding in effect prior to this court's grant of en banc review. (ER, 170-181.) Given the reasonable likelihood that the Ninth Circuit's forthcoming en banc decision in *Peruta* will define the scope of the Second Amendment with respect to sheriff screening of applications for a license to carry a concealed weapon, and the possibility that this court may specify a standard of appellate review in this context, the Sheriff contends that *Peruta* is a related case.

LEROY SMITH
County Counsel, County of Ventura

Date: December 9, 2015

/s/ Marina Porche
MARINA PORCHE, CSB # 162809
Assistant County Counsel

Attorneys for Defendant-Appellee
Ventura County Sheriff's Department

# CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure, rule 32(a)(7)(C),

the text of this brief consists of 9,657 words as counted by the Wordperfect

version X7 word processing program used to generate this brief.

LEROY SMITH
County Counsel, County of Ventura

Date:  December 9, 2015        /s/  Marina Porche
MARINA PORCHE, CSB # 162809
Assistant County Counsel

Attorneys for Defendant-Appellee
Ventura County Sheriff's Department

**CERTIFICATE OF FILING AND SERVICE**

I certify that on December 9, 2015, I electronically filed the foregoing **APPELLEE'S RESPONDING BRIEF** with the Clerk of the United States Court of Appeals.

I also served the foregoing **APPELLEE'S RESPONDING BRIEF** on:

JONATHAN W. BIRDT
Law Office of Jonathan W. Birdt
18252 Bermuda Street
Porter Ranch, California 91326
(818) 400-4485

On December 9, 2015, by mailing to said attorney a correct copy thereof, contained in a sealed envelope, with postage paid, and deposited in the U.S. mail at Ventura, California on said day.

/s/  Marina Porche
MARINA PORCHE, CSB # 162809
Assistant County Counsel

Attorney for Defendant-Sheriff
Ventura County Sheriff Department